IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 12, 2016

**STATE OF TENNESSEE v. JAMES SHETTLES**

**Appeal from the Criminal Court for Shelby County**
**No. 13-05346    Glenn Wright, Judge**

_____

**No. W2015-01529-CCA-R3-CD  -  Filed September 23, 2016**

_____

The Defendant, James Shettles, was convicted by a Shelby County Criminal Court jury of aggravated assault, a Class C felony, for which he is serving a four-year workhouse sentence on probation. *See* T.C.A. § 30-13-102 (Supp. 2012) (amended 2013). On appeal he contends that: (1) the evidence is insufficient to support his conviction, (2) the trial court erred in admitting a recording of a 9-1-1 call, and (3) the trial court erred in failing to remove a juror. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Gregory D. Allen (on appeal) and Lauren Pasley-Ward (at trial), Memphis, Tennessee, for the appellant, James Shettles.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a June 6, 2013 incident between the Defendant and Ladeia Boyd. The Defendant believed that Ms. Boyd's son had stolen the Defendant's lighter on an earlier date.

At the trial, the victim testified that the Defendant lived two houses away from her mother. She said that on June 6, 2013, she and her mother drove to her mother's house, that the Defendant approached her as she was seated in the driver's seat with the windows rolled down, that the Defendant held a stick, and that he said her son had the

Defendant's lighter. She said the Defendant made racial slurs, cursed at her, and threatened to "blow [her] m----- f------ head off" and to kill the victim's mother. She said he demanded his lighter, which he said her son had stolen from inside the Defendant's house. She said that the Defendant swung the stick three or four times and tried to hit her and that she grabbed the stick. The victim described the stick the Defendant held as antique, handmade or carved, long, and "black and gray or white." She described the Defendant as "very, very angry." She said she was surprised and afraid.

The victim testified that after she grabbed the Defendant's stick, she placed the car's transmission in park. She said the Defendant continued cursing and using racial slurs. She said the Defendant moved toward his house and said he was going to "blow [the victim's] head off." She said she thought the Defendant was going to get a gun, but she then said she stood outside the car because she thought the Defendant "was bluffing." She said that she told her mother not to worry and to go into the house and that her mother called 9-1-1, which the victim did not realize at the time. She said her mother went inside but came back out and stood on the porch. The victim said that if she had tried to drive away, the Defendant could have turned his attention to her mother.

The victim testified that the Defendant came outside in less than a minute with an "antique looking gun," which she thought was silver. She said the Defendant stated that she was "dead" and was "going to burn in hell." She said he said he was going to burn down the victim's mother's house. She said the Defendant waved the gun and pointed it at her. She said that although she was scared, she said, "[I]f you're going to wave that gun, you better use it." She thought the Defendant would have pulled the trigger if she had run. She said that ultimately, however, she drove away but returned a short time later when the police wanted her to come back to the scene to make a statement about what occurred. She said she never threatened the Defendant or displayed or used a weapon.

When asked about eyewitnesses, the victim testified that her mother had died the previous Monday. She said that a Hispanic "young man" and "girl" who lived in the house between her mother and the Defendant stood in their carport but that no adults were outside.

The victim said that she had not talked to the Defendant previously but that she had seen him walking his dog previously. She said she went to her mother's house frequently. She said she had never seen the Defendant with a cane previously. She agreed the stick the Defendant had on June 6 could have been used as a cane.

The victim testified that her now-eighteen-year-old son had lived with her mother at the time of the incident. She said her middle son, who was ten at the time, stayed but

did not live with her mother when the victim was at work. She said the middle son was the son the Defendant claimed stole his lighter.

The victim testified that the Defendant never tried to talk to her about the lighter and that he immediately began threatening her and demanding the lighter. She said the son whom the Defendant accused of stealing the lighter was in the backseat during the incident. She said that when the Defendant went to his house to retrieve the gun, she asked her son about the lighter, that he said he "didn't touch a lighter," and that he said he had only been to the Defendant's front door but not inside the Defendant's house. She later said her son stated he had only been in the Defendant's kitchen.

The victim denied that she had a gun at the time and that she told the Defendant she was going to "blow [his] head off." She said that during the confrontation, her mother stood on the porch. She said that her mother was talking on the telephone but that she did not know to whom. She said her son stayed in the car. When asked for the amount of time over which the incident transpired, she said it occurred quickly. She said that she left the scene initially but that she returned when her mother told her by telephone that the police were on their way and that she would be needed. She acknowledged that she was not the person who called the police.

The victim testified that she did not recall the Defendant's reporting stolen property to the police. She said an officer at the scene asked her son if he had picked up a lighter and about the extent to which her son went into the Defendant's house.

Memphis Police Officer David Day testified that on June 6, 2013, he and another officer, whom he did not identify, responded to a call regarding an armed individual. He said that when he arrived at the scene, he saw the victim's mother outside and a few children in front of the house between the victim's mother's house and the Defendant's house. Officer Day said the children were three to five years old. He said he spoke with the victim's mother and was informed that a neighbor threatened the victim, attempted to hit her with a stick, and pointed a gun at her.

Officer Day testified that he and the other officer went to the Defendant's house within a couple of minutes of arriving at the scene, that they knocked on the carport door, that they had their weapons drawn, and that the Defendant came to the door after a couple of minutes. Officer Day said that the Defendant seemed disgruntled and angry and that the Defendant made racial slurs and referenced the victim by name. Officer Day said the Defendant stated that he had an altercation with the victim, that he attempted to hit her with a stick, and that he had gone inside to retrieve a gun. Officer Day said that the Defendant offered the information without being questioned and that the Defendant asked

for a lieutenant to come to the scene. Officer Day said that while they waited for the lieutenant to arrive, the officers found a stick or cane on the ground between the victim's mother's house and the Defendant's house but waited to collect it until the lieutenant arrived. Officer Day said that after the lieutenant arrived, the Defendant gave written consent to search of his home. Officer Day said the Defendant took the officers inside the house to the gun. Officer Day said that the gun was a silver, plastic toy gun, that it appeared to be a weapon, and that it did not have an orange tip or other indication it was a toy. The toy gun was received as an exhibit.

Officer Day testified that they detained the Defendant in a police car after speaking with him but before the lieutenant and the victim arrived. Officer Day said the Defendant's body language and voice were aggressive, that the police were justified in detaining the Defendant, and that Officer Day was concerned about his safety. Officer Day said the victim returned to the scene about ten minutes after he and the other officer arrived and that she related facts corresponding with those stated by her mother.

Officer Day testified that the police attempted to talk to the children from the neighboring house but that the people inside the house "didn't want to have anything to do with it." He said the Defendant mentioned that the dispute with the victim had been over a lighter. He did not think the victim's son was at the scene when he was there. He said he had not spoken to anyone other than the victim, the victim's mother, and the Defendant.

Ruben Romero testified for the defense that he was the Defendant and the victim's neighbor on the date of the offense. He said that he did not know the people well who lived at the victim's house but that he had known the Defendant for about fifteen years.

Mr. Romero testified that on June 6, 2013, he was twenty years old. He said that as he stood on his porch with his then-nineteen-year-old sister and his sister's friend, he saw the Defendant walking his dog. Mr. Romero said the Defendant had a cane that the Defendant typically used to "hold the dog." He said that the victim drove up and stopped her car in front of Mr. Romero's driveway. He said he heard the Defendant and the victim arguing about a lighter the Defendant thought the victim's son had stolen from the Defendant's house, although Mr. Romero could not hear everything the Defendant and the victim said. He said, however, that the Defendant and the victim began screaming at each other "out of the blue." He said the victim cursed at and made racial remarks to the Defendant. He said the Defendant became angry when the victim stated that the Defendant was mad about his missing lighter because the Defendant wanted to smoke marijuana. Mr. Romero said that the victim continued insulting and cursing at the Defendant and that the Defendant walked away and went inside the Defendant's house.

Mr. Romero said that the victim was standing outside her car, that she continued yelling when the Defendant walked away, and that she was "grabbing to her purse."

Mr. Romero testified that the Defendant came outside with a plastic or rubber gun that Mr. Romero recognized as "fake." Mr. Romero stated the victim said, "[S]hoot me, shoot me." He heard the victim and the Defendant yelling profanity but could not discern everything they said.

Mr. Romero testified that during the altercation, he never saw the Defendant hit the victim with a stick. Mr. Romero said the Defendant and the victim were two to three feet apart during the altercation. Mr. Romero said that the stick looked like a cane and that he regularly saw the Defendant with the cane on the Defendant's shoulder. Mr. Romero said the Defendant used the cane to hold back the Defendant's dog. Mr. Romero said he did not hear the Defendant say he was going to kill the victim during the altercation.

Mr. Romero testified that the victim did not live in the house next to his but that the victim's parents and the victim's oldest son lived there. Mr. Romero said the victim's other two children stayed with the grandparents regularly. Mr. Romero said he did not associate with the residents of the house because his car was burglarized a month after they moved to the neighborhood. He said, however, that he had spoken with a ten-year-old boy at the house when the child had been outside in the yard with no one home. Mr. Romero said that the boy asked for water and to use a telephone and that he and his sister gave the boy water and allowed him to use the telephone. Mr. Romero said he had seen the boy go to the Defendant's house but said the boy and the Defendant no longer spoke after the boy took the lighter.

Mr. Romero testified that three or four police officers arrived, that one of the officers told him and his sister to go inside, and that the police did not ask him for information. He said an officer told his eleven-year-old sister and fourteen-year-old brother that the officer could not speak with them. He said he never gave a statement to the police about the relevant events. Mr. Romero said the victim continued to scream profanities at the Defendant after the officers placed the Defendant in a patrol car.

The Defendant testified that he walked his dog with a cane in the event another dog attacked his dog. He said the victim's mother had a large dog that she did not restrain and who attacked people in the street. He said that at the time of the incident with the victim, the victim's mother and the victim's mother's husband had lived in his neighborhood for about one and one-half years. He said he had seen but not spoken with the victim before the incident. He said, though, that she was aware of who he was

-5-

because she had been interviewed by the police after he filed a police report about the missing lighter.

Regarding the date of the incident, the Defendant testified that as he walked his dog on the sidewalk near the Romeros' front yard, the victim saw him and slammed on her brakes. He said the victim had just dropped off her mother. He said that the victim stared at him for about fifteen seconds and that he asked her when she was going to return his lighter. He said the victim cursed at him and asked why he had reported to the police that she was a negligent mother. The Defendant acknowledged having talked to the police about "how the boys got left off" with no supervision other than their ailing grandmother. He said he called the victim a liar and a thief but denied using racial slurs against her. He said he became angry and raised his voice when the victim stated he wanted the lighter in order to smoke crack cocaine. He denied threatening to shoot the victim and said he had never owned a weapon. He stated, however, that he told the victim it was a miracle no one had shot the victim's family due to the way they behaved. He said the victim stated that if he was going to shoot her, he had better kill her because she had a gun in her handbag. He said he fled into his house because he thought the victim might shoot him. He denied swinging his cane at the victim and said it remained on his shoulder. She said the victim remained inside her car until after he had gone to his house and returned. He said that he got a "cap pistol" his father gave him when he was a child and walked onto his driveway to see where the victim was. He said that when he went outside, the victim was in the victim's mother's driveway, about sixty yards away. He said that he never pointed the cap pistol at anyone or pretended it was a real gun and that he held it at his thigh when he went outside. He said that after he determined the victim's location, he went inside his house.

The Defendant testified that three to five minutes after he returned to his house, the police knocked on his door. He said he was on the telephone with 9-1-1 about the incident when the police knocked. He said that when he answered the door, two officers had pistols cocked and pointed at him. He said the officers did not handcuff him but placed him in a patrol car. He said he remained in custody until he was bailed out of jail the following day. The Defendant said he was truthful with the police about what happened. He said he was not agitated or upset when he spoke to them. He said he was detained in the police car for about an hour before the officers asked if he would consent to a search of his home for the cap pistol. He said that he agreed, that a lieutenant came to the scene, that he and two officers went into the house, that he showed them where the gun was, and that he was arrested. He said that he was taken outside and placed in a patrol car, that an officer told the victim the gun was a toy, and that the victim alleged for the first time that the Defendant had tried to hit her with a stick. He said the victim

walked into his carport and showed an officer the Defendant's cane, which the officer collected.

The Defendant recalled an occasion in April 2013 when he was approached by the victim's ten-year-old son while the Defendant did yard work. The Defendant said the child came to the Defendant's carport with a lawn chair and said he was home alone and wanted to visit with the Defendant. He said that after about an hour, the child asked for food and stated that his grandmother was asleep. He said he fed the child. He said the child asked to see inside the Defendant's house and stated that the Defendant must be rich. The Defendant told the child not to go inside the house. The Defendant said that about one and one-half hours later, he went inside to use the restroom and that when he came out of the restroom, he found the child in the house looking into the Defendant's refrigerator. He said, "[A]t this point I run him off." The Defendant said the child returned about two hours later and stated the child's grandmother wanted to see the Defendant. He said that he went to the grandmother's house, that she lay on a couch, that she asked him to take her eighteen-year-old grandson to a movie theater, and that she stated she did not have money for gas. He said that he went home to prepare to take the older grandson to the theater but that he did not complete the task because within about five to ten minutes, an ambulance appeared at the grandmother's house. He said that he had done favors for the grandmother's husband but had never met her until this encounter.

The Defendant testified that on the day after these events, he was unable to find his lighter. He said that after searching for about thirty minutes, he realized the ten-year-old child had taken the lighter because it had been in his kitchen. He decided to talk to the child's grandfather, but on his way to do so, he saw the eighteen-year-old grandson on the street. He asked the older grandson about the lighter, and the older grandson stated that the younger grandson had shown him the lighter the previous day. The Defendant said that the older grandson stated he would return the lighter to the Defendant, that the Defendant suggested the grandson speak to the grandson's mother, and that the grandson said he hated his mother and did not talk to her. The Defendant said he spoke to the grandmother's husband, Lester, who was intoxicated and unconcerned about the lighter. The Defendant said Lester stated that he would talk to the younger grandson and that he did not talk to the victim and could not stand her. The Defendant stated that the lighter was not returned to him and that he filed a police report the next day.

Memphis Police Department Communications Bureau employee Anthony Elliott testified as a rebuttal witness that he had reviewed a recording of a 9-1-1 call relative to this case. In the recording, which was played for the jury, the female caller stated that a neighbor named Jim was "threatening to shoot" her daughter.

The jury found the Defendant guilty of aggravated assault, and the trial court imposed a four-year workhouse sentence, to be served on probation. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because the State failed to prove that the victim reasonably feared imminent bodily injury. The State contends that the proof is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn 2009)).

As relevant to this appeal, aggravated assault is committed by a person who "[i]ntentionally or knowing commits an assault . . . and [u]ses or displays a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(ii) (Supp. 2011) (amended 2012, 2013, 2015). Assault is committed by a person who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2) (2010) (amended 2013, 2016). A deadly weapon includes "[a]nything that in the manner of its use or intended

use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5)(B) (Supp. 2011) (amended 2014).

The Defendant argues that the State failed to prove the victim reasonably feared bodily injury because the victim's testimony shows she was unafraid of the Defendant and his actions. He notes her testimony that she thought the Defendant was "bluffing" after the initial confrontation, in which she said the Defendant attempted to hit her with a stick, threatened to "blow [her] head off," and went to his house. He also notes her testimony that she told her mother not to worry and to go inside and that she did not leave the scene when the Defendant went inside. He likewise notes Mr. Romero's testimony that he did not see the Defendant advance toward or hit the victim with a stick. He also relies upon his own testimony that the stick was a walking cane he used regularly and the victim's acknowledgment that the stick could have been a cane.

In essence, the Defendant asks us to view this evidence in isolation, apart from the victim's testimony that the Defendant tried repeatedly to hit her with a stick and that she was afraid. We likewise note Officer Day's testimony that the Defendant stated he had attempted to hit the victim with a stick. As we have stated, we review the evidence in the light most favorable to the state. *See Vasques*, 221 S.W.3d at 521. We do not reweigh the evidence or make independent determinations of witness credibility. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547. The evidence reflects that while the victim was seated in her car, the Defendant tried to hit her with a stick, which placed her in fear. The evidence likewise shows that the stick the Defendant possessed was a walking cane. This court has said that a walking cane may be a deadly weapon. *State v. John Brunner*, No. W2008-01444-CCA-R3-CD, 2009 WL 2151822, at *9 (Tenn. Crim. App. July 17, 2009), *perm. app. denied* (Tenn. Nov. 23, 2009); *State v. Hagan Paul Roberts, II*, No. 03C01-9707-CR-00259, 1998 WL 748472, at *4 (Tenn. Crim. App. Oct. 19, 1998), *perm. app. denied* (Tenn. May 3, 1999). The evidence supports the jury's determination that, in the manner in which the Defendant used the cane, it was a deadly weapon.

The Defendant also argues that he possessed a cap pistol, not a gun, that he never pointed it at the victim, and that Mr. Romero said he knew the gun was not real. He also notes that he testified he never threatened to shoot the victim and that he was fearful of the victim after her statement that she had a gun in her handbag. We do not consider the evidence regarding the cap pistol to be relevant to the question of the sufficiency of the evidence, however, because the Defendant was charged with aggravated assault with a deadly weapon. By all accounts, the gun was a toy, and it was not capable of causing death or serious bodily injury as required by the statute. *See* T.C.A. § 39-11-106(a)(5)(B). We note, as well, the evidence that the Defendant swung the stick at the victim before the victim's statement about having a gun in her handbag.

We conclude that the evidence is sufficient to support the Defendant's conviction. He is not entitled to relief on this basis.

## II

### Admission of the Recording of the 9-1-1 Call

The Defendant contends that the trial court erred in admitting a recording of the victim's mother's 9-1-1 call as rebuttal evidence and that it violated his confrontation rights because the victim's mother was deceased and therefore unavailable for cross-examination. The State contends that the court did not err in admitting the evidence. We agree with the State.

As rebuttal proof, the State sought to introduce the recording of the victim's mother's 9-1-1 call. The defense objected on the basis the recording could have been offered by the State during its case-in-chief and that the recording did not rebut any proof offered during the Defendant's case-in-chief. The trial court reviewed the recording *in camera* and ruled that the evidence was relevant and admissible to rebut the Defendant's testimony that he did not have a gun. The court also ruled that the evidence was an excited utterance and therefore admissible as a hearsay exception. The court limited the admissibility of the recording, however, to the portion addressing whether the Defendant had a gun. The court excluded the portion of the recording in which the victim's mother made a statement about the Defendant's saying he was "sending a gang down there" and her statement the Defendant smoked "dope" and drank. In the recording that was played for the jury, the caller stated that a neighbor named Jim was "threatening to shoot" her daughter.

### A.  Rebuttal Evidence

We consider, first, the Defendant's challenge to the evidence as improper rebuttal evidence. Evidence that explains or controverts evidence previously offered by an adverse party is proper rebuttal evidence. *State v. Lunati*, 665 S.W.2d 739, 747 (Tenn. Crim. App. 1983); *see Cozzolino v. State*, 584 S.W.2d 765, 767 (Tenn. 1979), *abrogated on other grounds by State v. Reid*, 91 S.W.3d 247, 279-80 (Tenn. 2002). As with all evidence, rebuttal evidence must be relevant and material. *Lunati*, 665 S.W.2d at 747. Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010)

(citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). This standard is likewise applicable to rebuttal evidence. *Lunati*, 665 S.W.2d at 747. An appellate court will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *Franklin*, 308 S.W.3d at 809 (citing *Lewis*, 235 S.W.3d at 141).

The Defendant contends that the State should not have been permitted to offer the 9-1-1 recording as rebuttal evidence after it elected not to offer it as proof during its case-in-chief. He argues that the evidence merely bolstered the victim's testimony, which had been presented during the State's case-in-chief. As we have stated, the victim testified that the Defendant approached her car, threatened to blow her head off, and repeatedly swung a stick at her. The Defendant testified during his case-in-chief that he never threatened to shoot the victim and did not swing a stick at her. The State then sought to introduce the 9-1-1 call for the purpose of rebutting his testimony.

In the State's case-in-chief, the victim characterized the Defendant as the aggressor in the confrontation, whereas the Defendant's testimony during his case-in-chief characterized the victim as the aggressor. Although the 9-1-1 call evidence would have been relevant generally if the State had offered it during its case-in-chief, the evidence was relevant specifically as rebuttal proof to controvert the Defendant's testimony about his conduct during the altercation. *See Lunati*, 665 S.W.2d at 747 (stating that evidence is relevant as rebuttal proof if it explains or controverts proof offered by an opposing party). The trial court did not abuse its discretion in admitting the recording of the 9-1-1 call as rebuttal proof. The Defendant is not entitled to relief on this basis.

### B. <u>Confrontation</u>

The Defendant also contends the admission of the 9-1-1 call recording violated his right to confront adverse witnesses because the victim's mother, who was the 9-1-1 caller, was deceased at the time of the trial. He argues that the recording contained the victim's mother's inadmissible hearsay statements.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence or otherwise by law. *Id*. at 802.

The Confrontation Clause provides a criminal defendant the rights to confront and cross-examine witnesses. *See* U.S. Const. Amends. VI, XIV; Tenn. Const. art. 1, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court concluded that "[w]here testimonial evidence is at

issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity to cross-examin[e]" witnesses who do not appear at a trial. A hearsay statement is testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id.* at 51-52 (internal quotation marks and citation omitted). In order for a testimonial statement to be admissible, the declarant must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the declarant. *Id.* at 53-55. However, if the declarant is available to testify and is subject to cross-examination, "the Confrontation Clause places no constraints at all on the use of . . . testimonial statements." *Id.* at 59 n.9.

Regarding the Defendant's argument that the evidence was hearsay, we note the trial court's ruling that the evidence was admissible as an excited utterance. The Rules of Evidence contain an exception to the rule excluding hearsay for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). The Defendant has not addressed why the trial court erred in ruling that this hearsay exception applied.

Our supreme court has said:

> We have described the "ultimate test" of whether a statement meets the excited-utterance standard as "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

*State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010). We have reviewed the 9-1-1 call recording. The victim's mother appears to be alarmed and concerned about the safety of herself and the victim. The victim's mother's statements in the recording and the victim's trial testimony indicate the call took place as the altercation was transpiring. Upon consideration, we conclude that the trial court did not err in determining that the evidence qualified under the excited utterance exception to the hearsay rule.

Regarding the Defendant's contention that admission of the evidence violated his constitutional right to confront witnesses, he argues that the record does not establish that the call was placed during an ongoing emergency because the record does not address whether the victim's mother was inside or outside her house during the call and whether the call was placed after the victim left the scene. As we have stated, the recording reflects that the victim's mother was alarmed by the events that were transpiring. She can

be heard talking to someone other than the 9-1-1 dispatcher, and her statements appear to relate to the dispute about the lighter. She urges the dispatcher to send the authorities to the scene. The victim testified that she was at the scene when her mother called 9-1-1, and her testimony indicates that her mother called 9-1-1 as the altercation transpired. We note, as well, the proof that Officer Day responded to the scene based upon the victim's mother's 9-1-1 call and that the victim's mother told Officer Day a neighbor had tried to hit her daughter with a stick and had threatened her daughter with a gun. The trial court did not err in overruling the Defendant's objection on confrontation grounds. *See Davis*, 547 U.S. at 828-29 (holding that, on facts presented, the victim's statements during 9-1-1 call were not testimonial because they were made with the primary purpose of obtaining police assistance for an ongoing emergency, not to provide testimonial evidence against the defendant).

Because the trial court did not abuse its discretion in admitting the 9-1-1 call recording, the Defendant is not entitled to relief on this basis.

### III

### Trial Court's Failure to Remove A Juror

The Defendant contends that the trial court should have removed a juror during the trial. The Defendant argues that a presumption of bias arose because the juror failed to disclose before the trial that he or she had recently lost a family member. The Defendant argues that the juror decided the case based upon personal emotions resulting "from the devastating loss of a 'loved one.'" At the end of the victim's testimony, the juror said, "I apologize, Your Honor. I lost a loved one this weekend, too." We note the victim's testimony that her mother had passed away recently. After the juror's statement, the court responded, "No problem," and the defense did not object or request that the juror be removed. This issue was not raised in the motion for a new trial. Appellate review of the issue is waived. T.R.A.P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . misconduct of jurors . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Moreover, we are not compelled by the facts of the case to consider the matter as one of plain error. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE